UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT W. JARDIN,

     Applicant,

v.                                    CASE NO. 8:14-cv-2299-SDM-JSS

SECRETARY, Department of Corrections,

     Respondent.

_____/

## **ORDER**

     Jardin applies under 28 U.S.C. § 2254 for the writ of habeas corpus (Doc. 1) and challenges his convictions for first-degree murder, robbery, burglary, and grand theft, for which Jardin is imprisoned for life.  Numerous exhibits support the response.  (Doc. 12)  The respondent admits the timeliness of the application (Doc. 11 at 4–5) and the exhaustion of all grounds.  (Doc. 11 at 6–7)

## I. **BACKGROUND**[1]

     Joseph Evans visited his aunt and uncle, Patrick and Evelyn DePalma, at their home on Sunday.  Evans knocked at the door and rang the doorbell, but no one answered.  Evans noticed that a shed next to the home was unlocked.  A lock on the door of another shed was broken.  Concerned, Evans called 911.

---

[1] This summary of the facts derives from the briefs on direct appeal. (Docs. 12-22 at 126–33 and 12-23 at 14–16)

A police officer arrived and peered through windows of the home.  The officer observed a mess in one bedroom and a pair of feet laying parallel to the floor in another room.  The officer kicked open the front door of the home and discovered both the DePalmas with fatal stab wounds.  A stereo, a VCR, a vacuum, a watch, and a kitchen knife block were missing from the home.

DNA swabbed from a milk jug in the refrigerator at the DePalmas' home matched Jardin's DNA.  A detective went to a pawn shop where Jardin had worked and found a rare watch that Jardin had given the owner to repair.  The DePalmas' granddaughter testified that the watch looked like the watch that belonged to her grandfather.  Jardin agreed to speak with the detective about a bar fight.  After waiving his constitutional rights, Jardin denied his involvement in the bar fight.  Another detective asked Jardin about the murders of the DePalmas.  Jardin denied either knowing about the murders or ever going to the DePalmas' home.

The detective searched Jardin's home and found a stereo.  At his neighbors' home, the detective found a vacuum that Jardin had lent to his neighbors.  The DePalmas' granddaughter testified that the vacuum and stereo looked like the vacuum and stereo that belonged to her grandparents.  Carpet fibers in the vacuum matched carpet fibers from the DePalmas' home.  The detective searched Jardin's car and found a set of keys hidden in the driver's seat cushion.  One key matched the post office box that belonged to the DePalmas.  A second key matched a lock on one of the sheds next to the DePalmas' home.  A third key belonged to a Kia car — the

same brand of car that the DePalmas owned.  Also, a grocery store tag on the key ring belonged to the DePalmas.

In his own defense Jardin testified as follows.  On the night of the murders, Jardin and two males named Rick and Bubb drove to the DePalmas' house.  Jardin had known Rick for a few weeks and thought that they were going to buy drugs. Rick told Jardin to wait in the car while he and Bubb went inside the house.  Jardin waited fifteen minutes and saw lights in the house turn on.  Jardin went inside and saw Mr. DePalma's body.  Jardin became nervous, felt like he could vomit, and drank milk in the fridge to settle his stomach.  Rick and Bubb took items including a stereo and a vacuum to the car.  Rick told Jardin to keep quiet or something might happen to his children.  The next day, Jardin saw the vacuum and the stereo in the back of his truck and brought both inside his home.  He found the watch in the console of his truck but did not know who put the watch there.  He also did not know about the keys that the detective found in the seat cushion in his truck.

A jury found Jardin guilty of two counts of first-degree murder, one count of robbery, one count of burglary of an occupied dwelling, and one count of grand theft. (Doc. 12-11 at 80–84)  In the penalty phase of the capital case, the jury returned a recommendation of life for the murder convictions.  (Doc. 12-11 at 119–22) The trial court sentenced Jardin to two consecutive life sentences for the murder convictions, two consecutive fifteen-year sentences for the robbery and burglary convictions, and a consecutive five-year sentence for the grand theft conviction. (Doc. 12-12 at 1–20)

## II.  <u>STANDARD OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

governs this proceeding.  *Wilcox v. Fla. Dep't Corrs.*, 158 F.3d 1209, 1210

(11th Cir. 1998).  Section 2254(d), which creates a highly deferential standard

for federal court review of a state court adjudication, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential

standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. . . . Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 693 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 694. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

When the last state court to decide a federal claim issues an explanatory and reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*,

138 S. Ct. 1188, 1192 (2018).  When the relevant state-court decision is not

accompanied with reasons for the decision, the federal court "should 'look through'

the unexplained decision to the last related state-court decision that does provide

a relevant rationale [and] presume that the unexplained decision adopted the same

reasoning." *Wilson*, 138 S. Ct. at 1192.  A respondent may contest "the presumption

by showing that the unexplained affirmance relied or most likely did rely on different

grounds than the lower state court's decision . . . ."  *Wilson*, 138 S. Ct. at 1192.

In a *per curiam* decision without a written opinion the state appellate court

affirmed Jardin's convictions and sentences.  (Doc. 12-23 at 32)  Similarly, in another

*per curiam* decision without a written opinion the state appellate court affirmed the

denial of Jardin's Rule 3.850 motion for post-conviction relief.  (Doc. 12-24 at 116)

A state appellate court's *per curiam* decision without a written opinion warrants

deference under Section 2254(d)(1).  *Wright v. Sec'y Dep't Corrs.*, 278 F.3d 1245, 1254

(11th Cir. 2002).  *Richter*, 562 U.S. at 100 ("When a federal claim has been presented

to a state court and the state court has denied relief, it may be presumed that the state

court adjudicated the claim on the merits in the absence of any indication or

state-law procedural principles to the contrary.").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state court decision is

limited to the state court record:

> We now hold that review under § 2254(d)(1) is limited to the
> record that was before the state court that adjudicated the claim
> on the merits. Section 2254(d)(1) refers, in the past tense, to
> a state-court adjudication that "resulted in" a decision that was
> contrary to, or "involved" an unreasonable application of,
> established law. This backward-looking language requires an

> examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court.

"[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1).  Jardin bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  The presumption applies to a finding of fact but not to a mixed determination of law and fact.  *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001).  Jardin's federal application presents the same grounds that he presented to the state court.  The state court's rejection of Jardin's claims warrants deference in this federal action.  (Docs. 12-13 at 14–33 and 12-23 at 134–39)

## III.  ISSUE ON DIRECT APPEAL

**Ground Three:**

Jardin asserts that the trial court erred by denying his motion to redact statements that he made during a recorded interrogation played for the jury. (Doc. 1 at 5)  He contends that the trial court should have redacted prejudicial statements about his drug use ("sub-claim A"), his knowledge of his *Miranda*[2] rights ("sub-claim B"), and his participation in bar fights ("sub-claim C").  (Doc. 1 at 5) The respondent admits that the ground is exhausted (Doc. 11 at 7) but argues that the admission of the statements did not violate due process.  (Doc. 11 at 15–22)

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

"[F]ederal courts will not generally review state trial courts' evidentiary determinations." *Taylor v. Sec'y, Fla. Dep't Corrs.*, 760 F.3d 1284, 1295 (11th Cir. 2014). However, relief is granted "if a state trial judge has correctly admitted evidence under state law, but this application of the state rule violated a specific federal constitutional right." *Thigpen v. Thigpen*, 926 F.2d 1003, 1012 (11th Cir. 1991). Also, relief is granted "if a state trial judge erroneously admitted evidence in violation of a state law and the error made the petitioner's trial so fundamentally unfair that the conviction was obtained in violation of the due process clause of the fourteenth amendment." *Thigpen*, 926 F.2d at 1012. "The standard in determining whether the admission of prejudicial evidence constitutes a denial of fundamental fairness is whether the evidence is material in the sense of a crucial, critical, highly significant factor." *Leverett v. Spears*, 877 F.2d 921, 925 (11th Cir. 1989). *Blackburn v. State of Ala.*, 361 U.S. 199, 206 (1960) ("[T]he Fourteenth Amendment forbids 'fundamental unfairness in the use of evidence whether true or false.'") (quoting *Lisenba v. People of State of Cal.*, 314 U.S. 219, 236 (1941)).

### Sub-claim A

Jardin moved to redact seven statements about his drug use (Doc. 1 at 5), which statements the trial court ruled admissible as follows.

### First Statement

[Trial counsel:]  I mean, there is a lot of discussion, Judge, basically, that I think needs to come out about his prior drug usage, being a drug addict. I think those are prior bad acts.

There has been no *Williams*[3] Rule. He's not been convicted of them. I don't think we have to have his[,] "And I got wrapped up in drugs a bit[,]" statement.

[Prosecutor:]     May I respond, Judge?

[Court:]          Yes.

[Prosecutor:]     Judge, with all due respect — and I have to go up and bring some law down for the Court — that is evidence of motive for the murders, that he committed the murders to — he's on the property to support his drug habit. And the mere fact that someone says — and I know I have the cases in that regard — that he murdered these people during a drug ripoff, or he murdered them to get money for drugs, that is not — I apologize — that's not legally sufficient to grant a suppression on that ground.

[Trial counsel:]  I'm not asking for suppression; I'm asking for redaction. And there is no statement by him that[,] "I did this in a drug-crazed thing; I did this for drugs or drug deal gone bad." There is none of those statements at this point to that effect.

[Court:]          . . . [Y]our position is that the statement made earlier during the course of the voluntary interview, where the defendant makes reference to being involved in, for lack of a better term, illegal use of drugs, that he made it — he indicated that [ ], the use of illegal drugs, was occurring contemporaneous in the time frame with the DePalma homicides?

[Prosecutor:]     Yes, Judge.

[Court:]          Well, it does seem to me . . . that with the charges of robbery and grand theft, a drug habit could be a motive for — or feeding

---

[3] *Williams v. State*, 110 So. 2d 654 (Fla. 1959).

|  | a drug habit could be a motive for those offenses. And if the defendant made admissions for having such a habit — |
|---|---|
| [Trial counsel:] | Motive is not relevant. It's not an element of the crime. |
| [Court:] | Motive is always something the jury can find and consider. I think the [S]tate should be allowed to present that. |

(Doc. 12-13 at 14–16)

Jardin admitted that he "got wrapped up in drugs a bit" around the time of the crimes. His statement about his drug use was relevant to prove his motive for committing the crimes and therefore inextricably intertwined with the crimes. *Caruso v. State*, 645 So. 2d 389, 393–94 (Fla. 1994) ("Quinn's testimony regarding Caruso's drug-related activities established the relevant context in which the criminal acts occurred, Caruso's state of mind when the murders took place, and his motive to commit a burglary, which in turn was relevant to the State's felony-murder theory."); *McGirth v. State*, 48 So. 3d 777, 787 (Fla. 2010) ("[E]vidence as to the defendant's drug-based relationship with the victims' daughter was relevant and inextricably intertwined with the crimes charged.").

Admission of a crime, wrong, or act inextricably intertwined with a charged crime does not violate the federal constitution. Consequently, Jardin was not entitled to relief. *Thigpen*, 926 F.2d at 1012. *Accord United States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998) ("Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or

forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.") (citation and quotation marks omitted).

### Second Statement

| | |
|---|---|
| [Trial counsel:] | Next one, Judge, begins on [the] bottom of Page 18, about six lines up from the bottom: |
| | ["]. . . I was going, you know, my wife had left with my kids. That was one of those times where I was drinking a lot. Like I told the other detective, I started doing drugs.["] |
| | ["]Yeah.["] |
| | ["]You know.["] |
| | ["]What kind of drugs did you — ["] |
| | ["]I was doing coke at the time.["] |
| | ["]Oh, sh*t, man, that and that's with — that sucks everybody in, brother.["] |
| | And towards the bottom of Page 19, it's[:] |
| | ["]Now when you were doing coke, who would you normally do it with back then?["] |
| | ["]I was doing it by myself. I was buying.["] |
| | ["]Yeah, that's bad.["] |
| | ["]That's why I knew I was bad.["] |
| | I don't see what relevance that would have at this point in time. |
| [Court:] | Wouldn't it go to what [the prosecutor] had argued earlier, provided it was within |

|  |  |
|---|---|
|  | that time frame and in the context of the time frames, again . . . your argument would be the same, that it goes to his motive? |
| [Prosecutor:] | Yes, sir. |
| [Court:] | He had a drug habit, cocaine, unlawful drug habit — |
| [Prosecutor:] | At or about the time that the DePalmas' homicide occurred, Judge. |
| [Court:] | All right. I would agree that that is evidence of a motive, why he would need to commit a burglary, grand theft [or] robbery. I think it's common knowledge within the community that illegal drug users are very often responsible for burglaries and thefts. [ ] [S]ociety is aware of that now. So I think the [S]tate should be allowed to have a jury hear that and consider it for whatever value they want to place upon it. What's next? |
| [Trial counsel:] | The next is a continuation of Page 20, where he goes: |
|  | ["]Working all day, partying all night, turn around, go to work the next day.["] |
|  | ["]Dude, you are working your ass off just to hurt yourself, man.["] |
|  | That's actually a continuation of the same conversation. So I assume the Court's ruling would be the same. |
| [Court:] | Yes. |

(Doc. 12-13 at 21–23)

Jardin's statements about his drug use around the time of the crimes were

relevant to prove his motive for committing the crimes and therefore inextricably

intertwined with the crimes. *Caruso*, 645 So. 2d at 393–94; *McGirth*, 48 So. 3d at 787.

Admission of his statements did not violate the federal constitution and,

consequently, Jardin was not entitled to relief.  *McLean*, 138 F.3d at 1403; *Thigpen*,

926 F.2d at 1012.

### Third Statement

| | |
|---|---|
| [Trial counsel:] | My next one is on page 21, Judge. Kind of gets to the heart of the drug abuse issue, it's seven, eight lines down. |
| | ["]Let me tell you something, man, that — that shit — and I've got relatives that have passed because of, you know, what — ["] |
| | ["]I've seen — ["] |
| | ["]I hear, I know what it makes people do, real fu*ked-up sh*t. But it's not who they are. Do you understand what I'm saying?["] |
| | ["]Right.["] |
| | ["]You know the addiction will make you do — you know it will make you hurt everyone in your life and do bad sh*t.["] |
| | And I don't think he can make these conclusions that my client is an addict, first off, and he's laying out that he's an addict and he does bad stuff. I don't think that should be before the jury. |
| [Court:] | Well, I — I guess — |
| [Trial counsel:] | I don't know of any independent evidence they're going to have to show that he did drugs. |
| [Court:] | Well, I guess it depends on the context in which the detective's statement was made. It does appear that, in many instances, not only in this case, but other cases, there are times when the officer we're discussing |

makes many type of comments about things that don't amount to a question, I guess is the best way to phrase it.

What was the defendant's response? I mean, did he deny he was an addict, or did he agree that he was? Nothing precludes an officer from asking a leading question.

[Trial counsel:]      His first response is "inaudible."

["]That's not who you are as a person.["]

So his response from [the detective]:

["]Well, the thing about it was, you know, I wasn't — all I was doing was just basically doing my own. I mean, I was keeping to myself.["]

["]Yeah.["]

["]And people couldn't understand that.["]

So he doesn't really respond directly to it.

["]I was working, so I didn't — I mean I was working with the company for sh*t. I had already been living close to it. It was the third school I was work[ing] on — ["]

They kind of go away from it. It really doesn't answer your question of: Does he admit that this is my problem? It does not do that.

[Prosecutor:]      Judge, my position would be that that is a question about addiction and how it can create things. And given the context in which it is asked and not an agreement or a denial, I fail to see how that rises to such a level that it's so unduly prejudicial, given the context in which it's made.

| [Court:] | Well, I'm not hearing anything attributable to the defendant. And I don't know where the [S]tate would be obligated to take out the question from the officer. It was a very lengthy, it sounds like [a] question. [B]ut it was a question. The response was what it was. So I think that, you know, to keep the context and continuity of the interview, I will allow that to remain in. |

(Doc. 12-13 at 25–27)

The detective's statements about drug addiction provided context to the interrogation. *McMillian v. State*, 214 So. 3d 1274, 1286 (Fla. 2017) ("When placed in 'their proper context,' an interrogating detective's statements to a suspect could be understood by a 'rational jury' to be 'techniques' used by law enforcement officers to secure confessions.") (quoting *Worden v. State*, 603 So. 2d 581, 583 (Fla. 2d DCA 1992)).  Because the detective did not opine on either Jardin's credibility or his guilt of the charged crimes, admission of the statements did not violate state law. *Gaines v. State*, 155 So. 3d 1264, 1271 (Fla. 4th DCA 2015).

Admission of the statements did not violate the federal constitution either and, consequently, Jardin was not entitled to relief. *Thigpen*, 926 F.2d at 1012. *Accord United States v. Guzman*, 754 F.2d 482, 487–88 (2d Cir. 1985) ("Guzman also challenges the admission, at trial, of Detective Robinson's testimony of the conversation in which the detective told Guzman that he was familiar with the organization that Guzman was working for and spoke with Guzman concerning the whereabouts of individuals apparently connected to this organization.

. . . [The detective's] questions were introduced, not for the truth of what he asserted, but to render Guzman's answers intelligible.").

### Fourth Statement

[Trial counsel:]          It continues on page 28, starting line 6.

[Detective:]  ["]You know, brother, let me tell you this, man, that's the biggest way to disconnect, man, is when you get caught up in addiction. And again, brother, that is a disease, man. Well, you know, addictions. Addictions are a disease and [—] unintelligible [—] I'm probably one of the few cops that [has] compassion, because I have actually lost relatives to addiction and — ["]

[Jardin:]  ["]I can say I beat it.["]

["]You know, that's good. We like to see a success story, man.["]

["]Like I said, I — you know, I turned [ ] around, and when I fell asleep on my job I knew I had a problem. I knew it, you know, my boss never said nothing to me. He's the one [who] found me sleeping.["]

Then the detective asked, at the bottom of the page: ["]How much time did you lose, a year of your life there?["]

["]What?["]

["]Drugs, what did it take from you?["]

And then, "hmm[,]" is the answer.

Again, he's labeling him as a drug addict, Judge. And I just don't think the officer has the right to come to that conclusion.

[Court:]          Even your own client indicates that he was and he beat it. That was his term, I presume.

| [Trial counsel:] | Yes. |
|---|---|
| [Court:] | So certainly, I think that's relevant and I will deny the motion to delete that portion. |

(Doc. 12-13 at 27–29)

Jardin's admission about his drug use around the time of the crimes was relevant to prove his motive for committing the crimes and therefore inextricably intertwined with the crimes. *Caruso*, 645 So. 2d at 393–94; *McGirth*, 48 So. 3d at 787. Admission of his statements did not violate the federal constitution and, consequently, Jardin was not entitled to relief. *McLean*, 138 F.3d at 1403; *Thigpen*, 926 F.2d at 1012.

### Fifth Statement

| [Trial counsel:] | Next one, Judge, on page 35. |
|---|---|
| | Detective — middle of [the] page — ["]Dude, I will tell you [what], man. Drugs make you, a nice guy, do stuff you normally wouldn't do. And the people that know you as a nice guy, but they — if they've ever [ ] seen [you] when — ["] |
| | I'm sorry, I'm trying to read verbatim. |
| | ["]If they've never [ ] seen [you] when you['re] [ ] you know, when you're — when you['re] [ ] just strung out real[ly] bad, they're not [going to] know it's the same guy, man. They're not [going to] know it's the same dude.["] |
| | ["]No.["] |
| | I don't know where he gets to make this conclusion that my guy is out getting strung out and being a different |

|  | individual. I don't see where that's within his expertise or some kind of professional opinion on that. |
|---|---|
| [Court:] | Well, it's a leading question requiring whether or not that description of the behavior of a given addict is what the defendant — the status of the defendant. That's how I read that question. |
| [Trial counsel:] | Well, his answer is no. |
| [Court:] | Yeah. |
| [Trial counsel:] | Then it's "[u]nintelligible," so [—] |
| [Court:] | He's denying that he falls into that category, it sounds like. So that will remain in. |

(Doc. 12-13 at 29–30)

The detective generally commented on the behavior of a person addicted to drugs, and Jardin agreed that a person who is "strung out real[ly] bad" acts differently.  Jardin's statement was relevant to prove his motive for committing the crimes and therefore inextricably intertwined with the crimes.  *Caruso*, 645 So. 2d at 393–94; *McGirth*, 48 So. 3d at 787.  Admission of his statements did not violate the federal constitution and, consequently, Jardin was not entitled to relief.  *McLean*, 138 F.3d at 1403; *Thigpen*, 926 F.2d at 1012.

### Sixth Statement

| [Trial counsel:] | Next one is on [page] 37, Judge, he goes — top of the page. |
|---|---|
|  | ["]People that are on drugs, people.["] |
|  | ["]Um-hmm.["] |

["]Most people get murdered, you know, nowadays it's — would you agree most people get murdered because of and most crimes happen nowadays because of drugs?["]

Defendant's answer: ["]I have to say if you probably just [—] unintelligible [—] I'd say, yeah.["]

Then it [goes] on: ["]Yeah, yeah, dude. Okay. Whether you know it or not, you are a drug addict. You're recovering, but you're a victim; you are a victim of fu*king drugs, yourself. So, you know, these folks probably a victim of frigging drugs, too, but just in a different way, you know what I'm saying?["]

I don't believe that should be admitted.

. . .

[Prosecutor:]   Judge, certainly, the defendant agrees with the question that is asked of him by the [detective]. And I think, given the context, that[ ] certainly, it's relevant.

[Court:]   Well, he does acknowledge that people who have drug addiction issues commit crimes. Again I think that's a given in the community; everybody is aware of that fact. And I think that when [the detective] made the comment about — I guess it sounded like he was inferring that the DePalmas were victims of drug violence. And I think that was based in fact because he believed the defendant was the one responsible for their demise and was doing it — did it during drug-induced circumstances or in an effort to get drugs.

So, I mean, I don't think there is anything misleading about that question. I would invite comment from the [S]tate.

| [Prosecutor:] | Judge, certainly, I think given the context in which it all occurred, it's certainly probative evidence with regard to this case. |

(Doc. 12-13 at 30–32)

Jardin agreed that drugs cause most crimes including murder.  Jardin's admission was relevant to prove his motive for committing the crimes and therefore inextricably intertwined with the crimes.  *Caruso*, 645 So. 2d at 393–94; *McGirth*, 48 So. 3d at 787.  Admission of his statements did not violate the federal constitution.  *McLean*, 138 F.3d at 1403; *Thigpen*, 926 F.2d at 1012.

The detective told Jardin that Jardin was both a drug addict and a victim. A rational jury would identify this statement as a technique used by the detective to secure a confession.  *McMillian*, 214 So. 3d at 1286.  Admission of this statement did not violate the federal constitution and, consequently, Jardin was not entitled to relief.  *Guzman*, 754 F.2d at 487–88.

### Seventh Statement

| [Trial counsel:] | Next one on page 41, Judge, about two-thirds of [the] way down. |
| | |
| | [Detective:]  ["]Bro, bro, you are a good guy who was massively addicted to the drugs in [the] past. Okay, I understand.["] |
| | |
| | His answer is: ["]No, I wasn't massively addicted to — ["] |
| | |
| | Detective: ["]Well, if, if, if — ["] |
| | |
| | ["]I mean I was.["] |
| | |
| | [Detective:]  ["]If it's taken over such a big piece of your life. Dude, any time you lose |

|  | time out of your life, addiction — it's more than you realize it is, brother, okay, if — ["] |
|---|---|
|  | I mean, that's just not based on facts or reality, Judge. Statements he's saying, assumption[s] he's making without proof. |
| [Court:] | But the defendant denies it. |
| [Prosecutor:] | Judge, and specifically in response to that question, though, the defendant says, [o]kay, then maybe I had an addiction. That's his answer to the question. |
| [Court:] | Yeah, I think that's relevant, probative, and shall remain in there. |

(Doc. 12-13 at 32–33)

Jardin's admission about his drug use around the time of the crimes was relevant to prove his motive for committing the crimes and therefore inextricably intertwined with the crimes. *Caruso*, 645 So. 2d at 393–94; *McGirth*, 48 So. 3d at 787. Admission of his statements did not violate the federal constitution and, consequently, Jardin was not entitled to relief. *McLean*, 138 F.3d at 1403; *Thigpen*, 926 F.2d at 1012.

### Sub-claim B

Jardin moved to redact a statement about his knowledge of his *Miranda* rights, which statement the trial court ruled admissible as follows (Doc. 12-13 at 16–19):

| [Trial counsel:] | Page 8, Judge, I think we need to take [out] the reference [to]: ["]I've been through this routine enough,["] after they read him *Miranda*. That implicates him in other criminal behavior. He's not a convicted felon. That's the middle of page 8. |
|---|---|

[Prosecutor:]      I see it. My position would be, Judge, it goes to his knowledge and under-standing of having had contact with law enforcement in the past, which does not, in and of itself, denote prior criminal activity in any way, shape[,] or form.

[Trial counsel:]   Certainly denotes contact with law enforcement and [—]

[Court:]           What is the question, and what is the answer and the text?

[Trial counsel:]   It's after he reads him *Miranda* for the alleged bar fight:

                   ["]Do you understand these rights as I explained them to you?["]

                   ["]Yes, I do — ["]

                   ["]Okay. Great.["]

                   ["] — I've been through this routine enough.["]

[Court:]           All right. Well —

[Prosecutor:]      If I may, Judge, just to add to what is there in the transcript:

                   ["]Oh, okay. Well, I just need you to initial — ["]

                   ["]No, I understand that.["]

                   ["]I just need you to initial right there and then sign it. Now, what bars did you work at as a bouncer?["]

                   And he says, ["]Lollipops.["]

                   Because — and I guess, [trial counsel] may very well be going there later on, when he is asked about having been in bar fights, he makes the comment of [ ]that occurred while he was a bouncer.[ ] And,

certainly, a bar fight involving a bouncer with law enforcement contact from an investigative standpoint does not, in and of itself, denote any criminal activity. So I think the —

[Court:]          Well, it does appear that the [S]tate has a duty, as best they can, when it presents these type of evidentiary matters [—] statements that are attributable to the defendant [—] to establish that they were freely and voluntarily and knowingly made. The fact that the defendant voluntarily made this statement, while I'm not going to concede that it amounts to an acknowledgement of prior criminal activity, it does certainly — and the Court would acknowledge it indicates that he's had contact with law enforcement in a — I guess, an interview — at least in an interview context.

But it seems to me that, given the duty of the [S]tate to show that any statements attributable to the defendant were freely [and] voluntarily made without coercion or duress, I think it's relevant and material, and I don't think it's prejudicial. So that will remain in.

After the detective advised Jardin of his *Miranda* rights, Jardin responded, "I've been through this routine enough." Taken in context with other statements, Jardin meant that he had fought with others when he worked as a bouncer at a bar and had spoken with police about those fights. The trial court admitted a recording of the detective's interrogation of Jardin into evidence at trial. (Doc. 12-16 at 42–122) The voluntariness of Jardin's statements to the detective was an issue for the jury and, consequently, Jardin was not entitled to relief. (Doc. 12-19 at 95) *Thigpen*, 926 F.2d at 1012. Fla. Std. Jury Instr. (Crim.) 3.9(b) (standard jury

instruction on the admission of a statement by a defendant); *Palmes v. State*,

397 So. 2d 648, 653 (Fla. 1981) ("[T]he inquiry at the pretrial hearing on the

admissibility of a confession is primarily the question of voluntariness; later, before

the jury, the question is what weight to give the confession in determining guilt.

The defendant's state of mind is relevant to this latter inquiry.").

### Sub-claim C

Jardin moved to redact a statement about his participation in bar fights, which

statement the trial court ruled admissible as follows (Doc. 12-13 at 19–21):

| | |
|---|---|
| [Trial counsel:] | Page 11, three-quarters of the way down, he makes the statement: ["]I have been in a lot of bar fights where I've walked away and I probably should have got arrested, okay? But I didn't start the fight, all I did was finish the fight.["] |
| | Again, we think this is prior uncharged criminal activity that they are alluding to. |
| [Prosecutor:] | And, Judge, that goes — that fits hand in glove with my earlier statement as described right after that by [the detective], where he says: ["]Well, see, like, also, if you are a bouncer. I bounced years ago, also. And I bounced at places — so sometimes you got to escort people out.["] |
| | ["]I — I'm writing — I don't understand this — I was writing this up to this, that either you worked there at the bar, because when you said that you were a bouncer, that works good, you know, everybody gets roughed up by bouncers, because they are drunks, they're belligerent, they are nasty, they jab at somebody, cold-cock somebody and whisk, throw them to the curb.["] |

The defendant's statement: ["]You open the door, yeah.["]

["]And then you get them out. So most of the time, it's nonsense, with regard to the bar fights.["]

So my position would be that — and taken in full context, I — respectfully, Judge, I don't believe that the probative value of that outweighs any potential prejudic[ial] effect, given the full explanation that the defendant gave.

[Court:]          Are you saying you think that that relates back to the — the statements by the defendant that he knows his rights, he knows *Miranda*?

[Prosecutor:]     Yes.

[Court:]          It gives the background where he's had his life experiences — he's been involved in incidents where — I guess it would be inferentially as a result of these incidents, as [the detective] points out, people complain and you have to go have an investigation?

[Prosecutor:]     Yes, sir.

[Trial counsel:]  All I would respond, Judge, is that at this point in the interview, *Miranda* is not an issue. He doesn't have to establish anything, because it's a voluntary meeting at this point, so I don't think *Miranda* is an issue nor relevan[t].

[Court:]          Well, to the extent that it goes to explain, you know, his experiences in getting involved in these type of situations that do have investigations involved in them, as it pertains to his knowledge of his rights, I will allow that to remain in, in that context.

After the detective advised Jardin of his *Miranda* rights, Jardin responded, "I've been through this routine enough."  Jardin's statements about the bar fights provided context to his statement about his knowledge of his *Miranda* rights.  The trial court admitted a recording of the detective's interrogation of Jardin into evidence at trial.  (Doc. 12-16 at 42–122)  The voluntariness of Jardin's statements to the detective was an issue for the jury and, consequently, Jardin was not entitled to relief.  (Doc. 12-19 at 95)  *Thigpen*, 926 F.2d at 1012.  Fla. Std. Jury Instr. (Crim.) 3.9(b); *Palmes*, 397 So. 2d at 653.

* * * *

Jardin does not show that the state court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).[4]  Ground Three is denied.

## IV.  **INEFFECTIVE ASSISTANCE OF COUNSEL**

Jardin claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)).  *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998),

---

[4] Jardin asserts that the state court unreasonably applied *Davis v. Washington*, 547 U.S. 813, 822 (2006) (Doc. 2 at 13), which held that the Confrontation Clause under the Sixth Amendment prohibits an out-of-court statement by a witness to a police officer under certain circumstances. Because Jardin challenges his own statements to police, neither *Davis* nor the Confrontation Clause applies.

explains that *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs an

ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is
> well settled and well documented. In *Strickland v. Washington*,
> 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the
> Supreme Court set forth a two-part test for analyzing ineffective
> assistance of counsel claims. According to *Strickland*,
>
> > First, the defendant must show that counsel's
> > performance was deficient. This requires showing
> > that counsel made errors so serious that counsel
> > was not functioning as the "counsel" guaranteed
> > the defendant by the Sixth Amendment. Second,
> > the defendant must show that the deficient
> > performance prejudiced the defense. This
> > requires showing that counsel's errors were so
> > serious as to deprive the defendant of a fair trial,
> > a trial whose result is reliable.

"There is no reason for a court deciding an ineffective assistance claim . . .

to address both components of the inquiry if the defendant makes an insufficient

showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to

have rendered adequate assistance and made all significant decisions in the exercise

of reasonable professional judgment." 466 U.S. at 690. "[A] court deciding an

actual ineffectiveness claim must judge the reasonableness of counsel's challenged

conduct on the facts of the particular case, viewed as of the time of counsel's

conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances,

the identified acts or omissions were outside the wide range of professionally

competent assistance." 466 U.S. at 690.

Jardin must demonstrate that counsel's alleged error prejudiced the defense

because "[a]n error by counsel, even if professionally unreasonable, does not warrant

setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.  To meet this burden, Jardin must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.

Jardin cannot meet his burden by showing that the avenue chosen by counsel proved unsuccessful.  *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).  *Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland*, 466 U.S. at 690–91.

Sustaining a claim of ineffective assistance of counsel under Section 2254(d) is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Richter*, 562 U.S. at 105.  *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) ("Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'") (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

In summarily denying Jardin's Rule 3.850 motion for post-conviction relief, the state court recognized that *Strickland* governs a claim of ineffective assistance of

counsel.  (Doc. 12-23 at 134–35)  Because the state court rejected the grounds

based on *Strickland*, Jardin cannot meet the "contrary to" test in Section 2254(d)(1).

Jardin instead must show that the state court either unreasonably applied *Strickland*

or unreasonably determined a fact.  In determining "reasonableness," Section

2254(d) authorizes determining only "whether the state habeas court was objectively

reasonable in its *Strickland* inquiry" and not independently assessing whether

counsel's actions were reasonable.  *Putman v. Head*, 268 F.3d 1223, 1244 n.17

(11th Cir. 2001).  The presumption of correctness and the highly deferential standard

of review require that the analysis of each ground begin with the state court's

analysis.

## A. <u>Grounds of IAC During Trial</u>

<u>**Ground One:**</u>

At trial Jardin testified that a male named Rick asked him if he wanted to use

drugs.  (Doc. 12-18 at 41)  Jardin responded that he did, and the two men went in

Rick's car to pick up Rick's friend Bubb.  (Doc. 12-18 at 41–42)  After picking up

Bubb, Rick drove for a mile to a dirt road and pulled into the driveway of a house.

(Doc. 12-18 at 42–43)  Jardin believed that a drug dealer who sold cocaine lived in

the house.  (Doc. 12-18 at 42–43)  Rick told Jardin to wait in the car, while Rick and

Bubb went inside.  (Doc. 12-18 at 43–44)

After fifteen minutes, Jardin saw the lights in the house turn on, and Rick

waved to Jardin to come inside.  (Doc. 12-18 at 44)  Jardin went inside, saw items in

the house turned upside down, and saw a man lying on the floor in a pool of blood.

(Doc. 12-18 at 44)  Jardin panicked and left the house to sit in Rick's car because he wanted to leave.  (Doc. 12-18 at 45–46)  Rick and Bubb brought items, including a stereo and a vacuum, from the house to the car.  (Doc. 12-18 at 46)

Florida Standard Criminal Jury Instruction 3.6(l) — the independent act instruction — states:

> If you find that the crime alleged was committed, an issue in this case is whether the crime of (crime alleged) was an independent act of a person other than the defendant. An independent act occurs when a person other than the defendant commits or attempts to commit a crime
>
> 1.   which the defendant did not intend to occur, and
>
> 2.   in which the defendant did not participate, and
>
> 3.   which was outside of and not a reasonably foreseeable consequence of the common design or unlawful act contemplated by the defendant.
>
> If you find the defendant was not present when the crime of (crime alleged) occurred, that, in and of itself, does not establish that the (crime alleged) was an independent act of another.
>
> If you find that the (crime alleged) was an independent act of [another] [(name of individual)], then you should find (defendant) not guilty of the crime of (crime alleged).
>
> If the name of the other person is known, it should be inserted here; otherwise, use the word "another."

Jardin asserts that trial counsel was ineffective for not requesting the "independent act" jury instruction.  (Doc. 1 at 3)  He contends that his defense was (1) that the murders by Rick and Bubb were outside the scope of the plan — the only plan to which he agreed — to buy drugs and (2) that the instruction was critical to his

only defense.  (Doc. 2 at 3–9)  The post-conviction court denied the claim as follows (Doc. 12-23 at 135–36) (state court record citations omitted):

> [T]he Defendant alleges that counsel was ineffective for failing to request the jury be instructed on the independent act doctrine. The Defendant states that his entire defense was based on the idea that, although he was present at the victims' home, the Defendant was present to buy cocaine, not commit murders, robbery or burglary and that the other people who were present at the home had committed the murders without his knowledge or complicity.
>
> The independent act doctrine arises[: . . .]
>
> > [w]hen one [co-felon], who previously participated in a common plan, does not participate in the acts committed by his [co-felon], 'which fall outside of, and are foreign to, the common design of the original collaboration' . . . . Under these limited circumstances, a defendant whose [co-felon] exceeds the scope of the original plan is exonerated from any punishment imposed as a result of the independent act . . . . Where, however, the defendant was a willing participant in the underlying felony and the murder resulted from forces which they set in motion, no independent act instruction is appropriate.
>
> *Harvey v. State*, 26 So. 3d 685, 687 (Fla. 5th DCA 2010) (quoting *Ray v. State*, 755 So. 2d 604, 609 (Fla. 2000)).
>
> In this case, although the Defendant urges that the Court find that counsel was ineffective for failing to request the jury be instructed on the independent act doctrine, the Defendant's defense was that he was not there to commit the underlying felonies that would have made this crime felony murder. Instead, as the Defendant states in his motion, his "entire defense hinged on the jury believing his testimony that he went to the DePalma home to buy cocaine." It has been found that where the defense is that the defendant was not there to commit the underlying felony, it would be inappropriate to give an instruction on independent causation which is inconsistent with the defense of not guilty of the underlying felony. *Maugeri v. State*, 504 So. 2d 22, 23 (Fla. 3d DCA 1987). To avail himself of the defense of the independent act doctrine, the Defendant

must necessarily concede to participation in the underlying felony. *Id.*

The Defendant's defense that he was there to buy cocaine, not to commit the underlying felonies of robbery or burglary, or to commit murder, is inconsistent with an instruction on the independent act doctrine and thus there was not an act or omission on the part of counsel that was outside the broad range of reasonably competent performance under prevailing professional standards.

These latter two paragraphs expose the post-conviction court's unreasonable error of fact or law or both (depending on how one reads the paragraph).  At the outset of the first paragraph the judge stipulates that Jardin insists that Jardin intended to visit the DePalmas' home with Rick and Bubb to buy drugs, which is the "underlying crime" in this instance.  In the final sentence of the first paragraph, the judge erroneously, inexplicably, and unreasonably states that the independent act theory-of-defense instruction is unavailable to Jardin because "[t]o avail himself of the defense of the independent act doctrine, the Defendant must necessarily concede to participation in the underlying felony."

To commit this error, the judge must have thought that one or two or all of burglary, robbery, or murder were the underlying felony or felonies.  But the underlying felony was the purchase of drugs, to which Jardin readily concedes — insists on — his guilt.  This instance of misidentifying the underlying offense directly leads the judge to conclude erroneously that Jardin was not entitled to the independent act instruction and, consequently, to conclude erroneously that defense counsel was not ineffective for failing to request this theory-of-defense instruction,

the entitlement to which is an imperative if the facts are reasonably determined and the law is reasonably applied, neither of which occurred in this instance.

A defendant is entitled to a jury instruction on his theory of defense if any evidence supports the defense. *Elder v. State*, 296 So. 3d 440, 444 (Fla. 4th DCA 2020) ("A criminal defendant is entitled to have the jury instructed on the law applicable to his or her theory of defense where there is any evidence to support it, no matter how weak or flimsy.") (citation and quotation marks omitted); *Jackson v. State*, 253 So. 3d 738, 739–40 (Fla. 1st DCA 2018) (explaining that a criminal defendant is entitled to an instruction on his theory of defense "even if the only evidence of the defense is provided by the defendant's own testimony, and even if that testimony is weak or improbable") (citation and quotation marks omitted). *Accord Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.").

Jardin's testimony was that he, Rick, and Bubb planned a "common design or unlawful act" — buying drugs at the DePalma's home.  Further, Jardin testified that Rick and Bubb's commission of the murders, robbery, and burglary was "outside of and not a reasonably foreseeable consequence" of the common plan to buy drugs. Reasonable minds reviewing Jardin's testimony would agree that the testimony directly contradicts the state court's post-conviction findings, and consequently Jardin meets his burden under Section 2254(d)(2) by demonstrating that the state court unreasonably determined a fact. *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015)

("If [r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination.") (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)) (internal quotations omitted).

*Harvey v. State*, 26 So. 3d 685 (Fla. 5th DCA 2010), *Flemmings v. State*, 838 So. 2d 639 (Fla. 5th DCA 2003), and *McGee v. State*, 792 So. 2d 624 (Fla. 4th DCA 2001), confirm that the state court's determination is unreasonable.  In the three cases, the prosecution charged the defendant with murder.  The defendant testified that he planned a drug transaction with an accomplice, claimed the accomplice committed the murder, and denied that the murder was part of the plan.  The state appellate court reversed because the trial court incorrectly denied the defendant an independent act instruction.  *Harvey*, 26 So. 3d at 687; *Flemmings*, 838 So. 2d at 640; *McGee*, 792 So. 2d at 627.

If Jardin had testified that he participated in the burglary and robbery, the trial court would not have granted Jardin's request for the independent act instruction.  "Felons . . . are generally responsible for the acts of their co-felons.  As perpetrators of an underlying felony, co-felons are principals in any homicide committed to further or prosecute the initial common criminal design."  *Lovette v. State*, 636 So. 2d 1304, 1306 (Fla. 1994) (citation omitted).  Because the death of a victim is a foreseeable consequence of the commission of burglary, robbery, or any other inherently dangerous felony, Jardin's admission to participating in the crimes would have defeated his request for the independent act instruction.  *Lovette*, 636 So. 2d

at 1307 ("These killings lessened the immediate detection of the robbery and apprehension of the perpetrators and, thus, furthered that robbery. There is a causal connection between the robbery and the homicides . . . . The evidence, therefore, did not support an independent-acts theory as to the murders, and the court did not err in refusing to instruct the jury on such theory.");  *Ray v. State*, 755 So. 2d 604, 609 (Fla. 2000) ("Where . . . the defendant was a willing participant in the underlying felony and the murder resulted from forces which they set in motion, no independent act instruction is appropriate."); *Kitt v. State*, 260 So. 3d 462, 463 (Fla. 1st DCA 2018) ("[I]t was unquestionably foreseeable that someone could be shot or killed during the events set in motion by Appellant. In particular, it was foreseeable that the victim might flee in the course of the kidnapping and be shot and killed in order to prevent him from contacting the police.").

Because the state court unreasonably determined a fact, the district court owes no deference under Section 2254 to the state court's adjudication of the *Strickland* claim and reviews the claim *de novo*.  *Cooper v. Sec'y, Dep't Corrs.*, 646 F.3d 1328, 1352–53 (11th Cir. 2011) ("When a state court unreasonably determines the facts relevant to a claim, 'we do not owe the state court's findings deference under AEDPA,' and we 'apply the pre–AEDPA *de novo* standard of review' to the habeas claim.") (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008)).

Trial counsel performed deficiently by not requesting the independent act instruction.  The trial court would have granted trial counsel's request for the instruction.  According to Jardin, he, Rick, and Bubb agreed to go to the DePalmas'

home to purchase drugs.  Rick and Bubb murdered the DePalmas while Jardin

waited in the car.  When Jardin discovered Mr. DePalma fatally wounded, Jardin

panicked and left the house while Rick and Bubb stole items from the home.

Jardin's testimony contains material facts indistinguishable from the defendants'

testimony in *Harvey* and *Flemmings*, both of which appeared before Jardin's trial.

(Doc. 12-13 at 45)  *Harvey*, 26 So. 3d at 685; *Flemmings*, 838 So. 2d at 639.  The

prosecution tried Jardin in Hernando County, Florida, and consequently *Harvey* and

*Flemmings* bound the trial court to grant trial counsel's request for the independent

act instruction.  *Pardo v. State*, 596 So. 2d 665, 667 (Fla. 1992) ("[I]f the district court

of the district in which the trial court is located has decided the issue, the trial court is

bound to follow it.").

Jardin chose to testify and claimed — without contrary evidence in the

record — that he was outside the DePalmas' home when the crimes occurred and

that he neither planned to commit nor knew about the crimes until they had

occurred.  Jardin's only defense was that the robbery, burglary, and murders were

outside the scope of the agreement to purchase drugs and not a foreseeable

consequence of the agreement to purchase drugs.  Trial counsel performed

deficiently by not requesting the instruction.  *Lee v. Clarke*, 781 F.3d 114, 123–24

(4th Cir. 2015) (holding that counsel was ineffective for not requesting a heat of

passion instruction because ample evidence supported the instruction); *Pirtle*

*v. Morgan*, 313 F.3d 1160, 1169–72 (9th Cir. 2002) (holding that counsel was

ineffective for not requesting a diminished capacity instruction because counsel could

not tie the evidence to the law without the instruction); *Capps v. Sullivan*, 921 F.2d

260, 262 (10th Cir. 1990) (holding that counsel was ineffective for not requesting an

entrapment instruction after the defendant testified and admitted to committing the

crimes to support the defense).

Also, Jardin shows a reasonable probability that the outcome of trial would

have changed if trial counsel had not deficiently performed. *Strickland*, 466 U.S.

at 694. No direct unrebutted evidence suggested that Jardin personally killed the

DePalmas or stole from them. The prosecution's circumstantial evidence was

equally consistent with both Jardin's guilt and his innocence. DNA from a milk jug

in the DePalmas' refrigerator matched Jardin's DNA. This DNA evidence proved

that Jardin was inside the DePalmas' home but did not prove when Jardin was inside

the home. The DNA evidence was consistent with Jardin entering the home after

the crimes. Also, police found items that belonged to the DePalmas, including keys,

a vacuum, and a stereo, in Jardin's possession. His possession of these items did

not prove that he stole the items and was consistent with the Rick and Bubb's

transferring the items to Jardin after the murder.

The only issue in dispute at trial was whether Jardin participated in the

robbery, burglary, and murders or went to the home only to buy drugs. If the

trial court had instructed the jury on the independent act defense and if the jury had

believed Jardin's testimony, the jury would have acquitted Jardin of the robbery,

burglary, and murders. *Strickland*, 466 U.S. at 694 ("The result of a proceeding can

be rendered unreliable, and hence the proceeding itself unfair, even if the errors of

counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").

The instruction on principal liability — given without the independent act instruction — exacerbated the prejudice resulting from trial counsel's deficient performance.  The trial court instructed the jury as follows (Doc. 12-19 at 91):

> If the defendant helped another person or persons commit a crime, the defendant is a principal and must be treated as if he had done all of the things the other person or persons did if:
>
> > One, the defendant had a conscious intent that the criminal act be done.
> >
> > And, two, the defendant did some act or said some word which was intended to and which did incite, cause, encourage, or assist or advise the other person or persons to actually . . . commit the crime.
>
> To be a principal the defendant does not have to be present when the crime is committed.

Jardin testified that he wanted drugs and went with Rick and Bubb to the DePalmas' home to buy drugs.  Jardin admitted that he both consciously intended to buy drugs and caused and encouraged Rick to buy drugs.  Purchasing drugs is a crime in Florida.  §§ 893.13(2) and 893.135(1), Fla. Stat.  Without the independent act instruction, a diligent juror could logically conclude that Jardin "must be treated as if  he had done all of the things" that Rick did — which necessarily includes the robbery, burglary, and murders.  *United States v. Span*, 75 F.3d 1383, 1390

(9th Cir. 1996) (finding prejudice from counsel's failure to ask for a self-defense instruction because "the instructions as given were quite misleading").[5]

Trial counsel attempted to argue the independent act defense in closing argument as follows (Doc. 12-19 at 55–56):

> [Trial counsel:]
>
> [The prosecutor] said the defendant told you that Rick was a drug dealer. I don't think that's exactly what he said. I think he said he knew Rick from doing drugs at John Adkins's house, had partied with him on several occasions and sometimes he [bought] drugs with him. I think that's what he said about his relationship with this Rick guy. So, in the drug culture, people who hang around together and do drugs do drugs together. They share them, buy them.
>
> So what happens in this case? We know Mr. Jardin is working, making good money. Rick comes up, says, ["]Hey, you want to get some drugs,["] or however the conversation went, and doesn't it make sense, though? If you are going to a house, a drug dealer's house, doesn't that make sense that the new guy stays out in the car? There is cops, informants. People only like to make deals with people they know. So you leave the new guy in the car. You go in the house. And eventually, they call him in. But he didn't go in with the purpose to commit a crime. And since he didn't, he's not guilty of burglary, he's not guilty of robbery, and he sure isn't guilty of a homicide.

_____

[5] The jury found Jardin guilty of robbery without a weapon, a lesser included offense of the charged robbery with a deadly weapon, and burglary of an occupied dwelling, a lesser included offense of the charged burglary with a dangerous weapon. (Doc. 12-11 at 82–83)

- 39 -

Absent the proper instruction to the jury on the law, trial counsel's closing argument lacked the necessary and crucial validation of a theory-of-defense instruction.  Without the independent act instruction, the jury could not apply the law on an independent act defense to the evidence.  The trial court charged the jury to "follow the law spelled out in [the] instructions" and cautioned that "no other laws [ ] apply to this case."  (Doc. 12-19 at 102)  Trial counsel's deficient performance effectively deprived Jardin of his only defense at trial.  Because Jardin demonstrates both deficient performance and prejudice under *Strickland*, he is entitled to relief on Ground One.  *Lee*, 781 F.3d at 127 ("[I]t would matter little whether trial counsel's closing argument had been more adequately presented, because it was not supported by 'definitive and binding statements of the law' in the form of jury instructions.  This was prejudicial.") (citation omitted); *Pirtle*, 313 F.3d at 1174 ("There is no countervailing possibility that the jury rejected the diminished capacity defense on the merits, because it was not told of the availability of the defense. . . . [W]e conclude that there is a reasonable probability that, but for Pirtle's counsel's deficient performance, the outcome of his trial would have been different.").

**Ground Two:**

Jardin asserts that trial counsel was ineffective for not calling David Alexander Bostick to testify.  (Doc. 1 at 4)  Jardin contends that Bostick admitted to a detective that he was at the DePalmas' home during the crimes and testified at a deposition that he neither knew nor had ever met Jardin.  (Doc. 2 at 9)  Jardin asserts that

Bostick would have testified and corroborated his theory of defense.  (Doc. 1 at 4)

The post-conviction court denied the claim as follows (Doc. 12-23 at 138–39) (state

court record citations omitted):

> [T]he Defendant alleges that counsel was ineffective for failing
> to call David Alexander Bostick as a witness stating that at the
> time of his trial, there were charges pending against Bostick
> that were the result of an arrest affidavit that had been filed
> that stated that Bostick provided "corroborative crime scene
> information that was not public knowledge proving he was
> part of the murder including details about his and both subject
> one['s] and two's actions to eliminate evidence and steal from
> the victims." The Defendant states that had counsel called
> Bostick to testify, the testimony would have been such that it
> would have corroborated the Defendant's version of events and
> resulted in a jury acquittal.
>
> Although the probable cause affidavit filed against Bostick
> states that Bostick has provided crime scene information that
> proved he was part of the murder, Bostick's testimony at his
> deposition was inconsistent with his testimony to police. At
> the deposition, Bostick was asked about his interview with
> police, the details that he had provided regarding the crime
> scene and where he happened upon the information that he had
> provided to police. Bostick said that most of the information
> was suggested to him by the police. When asked if Bostick
> remembered admitting to being present at the crime scene and
> seeing his aunt and uncle dead, Bostick said that he did not
> remember telling police that he walked in after the homicide
> occurred and did not recall telling police that he had helped
> carry stuff out of the house in a bag.
>
> There is no reason to believe that if Bostick had been called, by
> counsel, to testify at trial, that Bostick's responses to counsel's
> questions would have differed from those in Bostick's
> deposition. Counsel would not have been able to call Bostick
> for the primary purpose of introducing his prior statement to
> police which would otherwise be inadmissible because he
> would be present to testify regarding the situation and the
> impeachment would be excluded. *Morton v. State*, 689 So. 2d
> 259, 265 (Fla. 1997).
>
> Counsel's decision not to call Bostick was not outside the broad
> range of reasonably competent professional performance under

> prevailing circumstances. The Defendant does not meet the first
> prong of *Strickland*. [The ground] is denied.

An arrest affidavit states that, after waiving his constitutional rights, Bostick told a detective that the DePalmas were Bostick's aunt and uncle.  (Doc. 12-23 at 120)  Bostick and two males visited the DePalmas' home, Bostick left to get a mobile telephone from the car, and when he returned he found his aunt and uncle dead.  (Doc. 12-23 at 120)  Bostick vomited in the kitchen sink.  (Doc. 12-23 at 120)  Bostick and the two males took valuables from the home; one of the males left in the DePalmas' car, while Bostick and the other male left in the other car.  (Doc. 12-23 at 120)  Bostick and the male stopped at a gas station.  (Doc. 12-23 at 120)  Bostick identified himself in surveillance video from the gas station.  (Doc. 12-23 at 120).

After the interrogation, Bostick testified in a deposition in Jardin's criminal case as follows (Doc. 12-24 at 53–55):

| | |
|---|---|
| [Trial counsel:] | During the course of your statement, according to the detective involved, you gave some detailed information that was not released to the general public; for example, you said that you drank milk at the scene of the crime. |
| | Where did you come up with that[?] [D]id the officer tell you something off the record, were they just some details and you're just regurgitating, how did you come up with stuff like that? |
| [Bostick:] | Most of it was suggested. |
| [Trial counsel:] | Okay. And how did they suggest things to you; I mean, what was going on? |

| [Bostick:] | Basically, [he] says, "Could this have happened?" |
| [Trial counsel:] | Did you have conversations with anybody from the Sheriff's Office outside of the interview room[?] I mean, when they walked you to the bathroom, did you get a small break, did you leave, what kind of stuff happened? |
| [Bostick:] | I remember being asked some questions in the restroom, but I don't recall what. |
| . . . | |
| [Trial counsel:] | Do you remember admitting to being there, seeing your aunt and uncle dead, do you remember telling him that? |
| [Bostick:] | No. |
| [Trial counsel:] | To make sure, so as we sit here today, you don't remember telling the cops that you walked in after the homicide occurred? |
| [Bostick:] | I don't recall what I said. |
| [Trial counsel:] | All right. Do you recall telling them you helped them carry stuff out of the house in a bag with some — a plastic garbage bag or something full of items? |
| [Bostick:] | No. |

The prosecutor moved to exclude Bostick's confession to police as hearsay, untrustworthy, and irrelevant. (Doc. 12-23 at 122–24) The trial court denied the motion and concluded that the defense could introduce Bostick's confession citing *Chambers v. Mississippi*, 410 U.S. 284 (1973). (Doc. 12-11 at 57–58 and 12-23 at 126)

In *Chambers*, 410 U.S. at 285–86, 289, the defendant was charged with the murder of a police officer and another male confessed to committing the murder but

later recanted his confession. The defendant called the male as a witness at trial and introduced the male's confession into evidence. 410 U.S. at 291. The prosecution cross-examined the male about his recantation. 410 U.S. at 291. The trial court denied the defendant an opportunity to examine the male as an adverse witness and confront him about the recantation, citing Mississippi's "voucher" rule. 410 U.S. at 291–92. Also, the defense sought to call witnesses to testify the male confessed on three other occasions. 410 U.S. at 292–93. The trial court sustained the prosecution's objection to the testimony under Mississippi's hearsay rule. 410 U.S. at 292–93.

*Chambers* holds, 410 U.S. at 297–303, that the trial court's rulings based on Mississippi rules of evidence violated the defendant's right to confront a witness and present a witness in his own defense because:

> The availability of the right to confront and to cross-examine those who give damaging testimony against the accused has never been held to depend on whether the witness was initially put on the stand by the accused or by the State. We reject the notion that a right of such substance in the criminal process may be governed by that technicality or by any narrow and unrealistic definition of the word 'against.' The 'voucher' rule, as applied in this case, plainly interfered with Chambers' right to defend against the State's charges.
>
> . . .
>
> Few rights are more fundamental than that of an accused to present witnesses in his own defense. *E.g., Webb v. Texas*, 409 U.S. 95, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972); *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *In re Oliver*, 333 U.S. 257, 68 S. Ct. 499, 92 L. Ed. 682 (1948). In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no

rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

In Jardin's case the post-conviction court unreasonably applied *Chambers* by concluding: "Counsel would not have been able to call Bostick for the primary purpose of introducing his prior statement to police which would otherwise be inadmissible because he would be present to testify regarding the situation and the impeachment would be excluded." (Doc. 12-23 at 138–39)  The post-conviction court cited *Morton v. State*, 689 So. 2d 259, 265 (Fla. 1997) which explains:

Obviously, no single rule can be delineated to cover all of the circumstances under which parties will seek to impeach their own witnesses. Generally, however, if a party knowingly calls a witness for the primary purpose of introducing a prior statement which otherwise would be inadmissible, impeachment should ordinarily be excluded. On the other hand, a party may always impeach its witness if the witness gives affirmatively harmful testimony. In a case where a witness gives both favorable and unfavorable testimony, the party calling the witness should usually be permitted to impeach the witness with a prior inconsistent statement. Of course, the statement should be truly inconsistent, and caution should be exercised in permitting impeachment of a witness who has given favorable testimony but simply fails to recall every detail unless the witness appears to be fabricating. In addressing these issues, trial judges must have broad discretion in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or confusion.

Like Mississippi's voucher rule, which prohibits a party from impeaching its own witness, Florida's rule in *Morton* would not have prohibited trial counsel from calling Bostick as a witness to introduce his confession. *Chambers*, 410 U.S. at 295. *Accord Bearden v. State*, 161 So. 3d 1257, 1267 (Fla. 2015) (applying *Chambers* to Florida's rule in *Morton*); *Curtis v. State*, 876 So. 2d 13, 20–23 (Fla. 1st DCA 2004) (same).

Also, the state court unreasonably determined that "Bostick's testimony at his deposition was inconsistent with his testimony to police." (Doc. 12-23 at 138–39) During the interrogation, Bostick told the detective that he was outside the DePalmas' home during the crimes. (Doc. 12-23 at 120) At his deposition Bostick testified that he could not remember what he told the detective but he neither recanted his confession nor appeared to fabricate his loss of memory. (Doc. 12-24 at 53–55) Reasonable minds reviewing Jardin's statements would agree that the testimony during the deposition does not directly contradict the statements during the interrogation. *Brumfield*, 576 U.S. at 313–14. *Pearce v. State*, 880 So. 2d 561, 569 (Fla. 2004) ("To be inconsistent, a prior statement must either directly contradict or be materially different from the expected testimony at trial."). Trial counsel could not have impeached Bostick with the confession and instead would have attempted to refresh Bostick's recollection with the detective's report memorializing the confession. *Shere v. State*, 579 So. 2d 86, 93 (Fla. 1991) ("It was improper to 'impeach' Greulich with her prior statements after she merely said she did not remember what happened, especially when those statements had not been shown to be materially inconsistent."); *Wilcox v. State*, 143 So. 3d 359, 379 (Fla. 2014) ("When

a writing is used only to revive present recollection of a fact, it is not required that the writing be written by the witness. . . . [W]ritings or objects used to refresh the memory of a witness need not be admissible evidence.") (citations omitted).

Because the state court unreasonably applied *Chambers* and unreasonably determined a fact, Jardin meets his burden under Section 2254. Consequently, the district court owes no deference to the state court's adjudication of the *Strickland* claim and reviews the claim *de novo*. *McGahee v. Ala. Dep't Corrs.*, 560 F.3d 1252, 1266 (11th Cir. 2009) ("Where we have determined that a state court decision is an unreasonable application of federal law under 28 U.S.C. § 2254(d), we are unconstrained by § 2254's deference and must undertake a *de novo* review of the record.").

Under the less deferential standard of review, Jardin's claim is without merit. Jardin asserts that trial counsel was ineffective for not calling Bostick as a witness at trial. (Doc. 1 at 4) Jardin contends that Bostick would have testified at trial (1) that Bostick was at the DePalmas' home during the crimes and (2) that Bostick had never met Jardin. (Doc. 2 at 9) Jardin asserts that Bostick's testimony would have supported his defense, and the outcome at trial would have changed if trial counsel had called Bostick as a witness. (Doc. 2 at 10–11)

Jardin speculates that Bostick's testimony at trial would have supported his defense. Jardin presents neither an affidavit nor testimony that the detective's report memorializing Bostick's confession would have refreshed Bostick's recollection at trial. At his deposition Bostick denied remembering what he told the detective.

(Doc. 12-24 at 55)  The detective wrote the report.  (Doc. 12-23 at 120)  Even though Bostick's statements contained in the report were admissible, Bostick could not have authenticated the report.  § 90.901, Fla. Stat.  *Buchanan v. State*, 575 So. 2d 704, 706 (Fla. 3d DCA 1991) ("[T]he genuineness of a writing may be established by the author's acknowledgment that he wrote it.").  *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006) ("This prejudice burden is heavy where the petitioner alleges ineffective assistance in failing to call a witness because 'often allegations of what a witness would have testified to are largely speculative.'") (quoting *United States v. Guerra*, 628 F.2d 410, 413 (5th Cir. 1980)).

Even if the detective's report would have refreshed Bostick's recollection, Bostick testified at his deposition that the detectives suggested to him details about the crimes.  (Doc. 12-24 at 53–55)  If Bostick testified at trial consistently with his confession to the detectives, the prosecutor would have meaningfully undermined Bostick's credibility before the jury by impeaching him with this deposition testimony.  Calling Bostick knowing he would suffer impeachment by the prosecutor is a risk and complication which counsel can reasonably (and often eagerly) elect to avoid.  *Sullivan*, 459 F.3d at 1110–11.

Lastly, even if Bostick had testified consistently with his confession, Bostick's testimony would have contradicted Jardin's defense.  Jardin testified that he went to the DePalmas' home to purchase drugs, waited in the car while Rick and Bubb went inside the home, and discovered fifteen minutes later that Rick and Bubb murdered the DePalmas.  (Doc. 12-18 at 41–44)  In support of his defense, Jardin

insisted that he was outside the DePalmas' home during crimes. Because Bostick would have testified that Jardin was not at the DePalmas' home during the crimes, Bostick's testimony would have undermined Jardin's defense. *Sowell v. Anderson*, 663 F.3d 783, 800 (6th Cir. 2011) (holding that the outcome at trial would not have changed under *Strickland* if trial counsel had called a witness because the witness's testimony contradicted the petitioner's version of events); *Horton v. Allen*, 370 F.3d 75, 86–87 (1st Cir. 2004) ("[T]he proposed testimony would have conflicted with Horton's own version of events (that he came home at 11 p.m.), leaving the jury with the option of rejecting the alibi witnesses'[ ] testimony or rejecting Horton's own story."); *Carpenter v. Vaughn*, 296 F.3d 138, 154–55 (3d Cir. 2002) ("[A]ny of the three accounts provided by Stewart before trial would have contradicted Carpenter's testimony in important respects. . . . Under these circumstances, it was objectively reasonable for Carpenter's counsel not to call Stewart as a witness to 'corroborate' his client, and Carpenter was not prejudiced by the lack of such 'corroboration.'").

Because the prosecutor would have critically impeached Bostick and Bostick's confession would have negated Jardin's defense at trial, the outcome at trial would not have changed. Consequently, Jardin demonstrates neither deficient performance nor prejudice under *Strickland*. Ground Two is denied.

**Ground Four:**

Jardin asserts that trial counsel was ineffective for not objecting to the prosecutor's use of statements to impeach Jardin at trial. (Doc. 1 at 6) The trial court had suppressed the statements because Jardin made the statements during an

interrogation conducted contrary to *Miranda*.  (Doc. 2 at 16–17)  ("sub-claim A")

Jardin further asserts that trial counsel was ineffective for not objecting to comments

in closing argument by the prosecutor about the suppressed statements.  (Doc. 2

at 17–18) ("sub-claim B")

### Sub-claim A

Jardin asserts that trial counsel was ineffective for not objecting to the

prosecutor's use of suppressed statements to impeach Jardin.  (Docs. 1 at 6 and

2 at 16–17)  He contends that trial counsel should have objected to the following

(Doc. 12-18 at 70, 73–74, 83–85):

| | |
|---|---|
| [Prosecutor:] | Now, did you also tell of somebody else who was in the DePalma house with you? |
| [Jardin:] | I don't recall, sir. I would have to say — I'm not sure. |
| [Prosecutor:] | How about your friend Tony, who committed suicide? |
| [Jardin:] | I don't know what you are talking about, sir. I don't know a Tony. |
| [Prosecutor:] | Did you not tell law enforcement that a friend of yours who was with you in the DePalma home blew his brains out? |
| [Jardin:] | I never made that statement, sir. |
| . . . | |
| [Prosecutor:] | I'm sorry, Mr. Jardin. I used the name Tony before. |
| [Jardin:] | Um-hmm. |
| [Prosecutor:] | At — how about Tom? |
| [Jardin:] | I believe that might have been correct, sir. |

[Prosecutor:]        You said previously to law enforcement that one of the individuals who was with you in the DePalma home was a guy who — your words, not mine, your words — was a guy, he blew his fu\*king brains out, Tom, a year, year and a half ago in Hernando.

[Jardin:]        I believe I said that, yes.

[Prosecutor:]        That was not true, was it?

[Jardin:]        As I said earlier, sir, when I tried to tell the detectives the truth, they didn't listen to me. So I gave them two other names, hoping to appease them.

. . .

[Prosecutor:]        Have you ever said that, ["]I'm trying to minimize everything for myself as much as I can["]? Keep looking at your lawyer, sir. He ain't going to help you.

[Jardin:]        Yes, I made that statement.

[Prosecutor:]        You made that statement?

[Jardin:]        I also made the statement that I wasn't —

[Prosecutor:]        Sir, I —

[Jardin:]        — going to prison —

[Prosecutor:]        — I haven't —

[Jardin:]        — for murder either.

. . .

[Prosecutor:]        You feel that with regard to the DePalma house and being in the DePalma house, you were with the wrong people at the wrong time?

[Jardin:]              I would say that I was with two individuals that I shouldn't have been with, yes.

[Prosecutor:]      And you were with the wrong people at the wrong place at the wrong time?

[Jardin:]              Yes, sir.

[Prosecutor:]      But you also think that, to use your words, ["]You'll be lucky if they put a needle in my arm["]?

[Jardin:]              That statement was made in reference to the interrogation, okay? And what had happened was I had —

[Prosecutor:]      Well, sir —

[Jardin:]              — Detective Lakin —

[Prosecutor:]      — excuse me.

. . .

[Prosecutor:]      And it's a yes-or-no question. You are lucky if they put a needle in your arm. You said that, didn't you?

[Jardin:]              In reference to the detective's statement —

[Prosecutor:]      Sir, excuse me —

[Jardin:]              — yes —

[Prosecutor:]      — you said you will be lucky if they put a needle in your arm, didn't you? That's a yes-or-no question, sir. Then if you want to explain, you go right ahead. But that's a yes-or-no question. You said that —

[Jardin:]              — when the detective —

[Prosecutor:]      — didn't you?

[Jardin:]              — asked me the question, yes.

The post-conviction court denied the claim as follows (Doc. 12-23 at 136–37)

(state court record citations omitted):

> [T]he Defendant states that counsel was ineffective for failing to object to questions by the State, that were based on statements given by the Defendant in an interview with police on July 10, 2008. The statements given by the Defendant, on July 10, 2008, were suppressed by the Court prior to trial. The Defendant states that the questions and references to these suppressed statements were harmful to his case because they were attacks on his credibility and his entire defense hinged on the jury's belief in his testimony. The Defendant claims that counsel's failure to object to the questions and the elicited testimony exposed the jury to prejudicial information and deprived him of the opportunity to have the injury remedied by a curative instruction to the jury.
>
> Although the Defendant has identified omissions on the part of counsel that he believes fall outside the broad range of reasonably competent performance under prevailing professional standards, the Defendant has not shown that he was prejudiced by these omissions in a fashion that so affected the fairness and reliability of the proceeding that confidence in the outcome of the trial has been undermined. As the Defendant notes, his defense hinged on the jury's belief of his testimony and although the Defendant places great weight on the State's use of suppressed statements to impeach his testimony, earlier in the State's cross-examination, the State had successfully impeached the Defendant's credibility using the Defendant's testimony at trial and statements that had not been suppressed. The Defendant admits, in his testimony to the jury, to lying to the [p]olice several times during his interview on July 9, 2008.
>
> The Defendant has not shown a reasonable probability that counsel's failure to object to the State's questions and obtain a curative jury instruction so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

The trial court suppressed Jardin's statements because a detective violated

*Miranda*. (Docs. 12-10 at 57–63 and 12-11 at 52–54) Jardin voluntarily went to the

police station, agreed to take a computer voice stress test, and signed a *Miranda*

waiver form.  (Doc. 12-10 at 57)[6]  After he took the test, Jardin stood up to leave and told the detective, "I've got told if I take this test and passed, I could go.  I'm ready to go."  (Doc. 12-10 at 58)  When the detective asked Jardin to sit down so that they could review the test, Jardin repeated, "I'm done[,] [Detective] Larkin."  (Doc. 12-10 at 58)  Jardin asked another detective if the detective was charging him with a crime. (Doc. 12-10 at 59)  When the detective confirmed that he was, Jardin responded, "Well, then I guess I better go hire a lawyer."  (Doc. 12-10 at 59)

Because the interrogation shifted from consensual to custodial and the detectives continued to interrogate Jardin without advising him of his *Miranda* rights, the trial court suppressed all statements that Jardin made after he invoked his rights. (Doc. 12-10 at 61–63)  The suppressed statements included (1) a male named Tom who "blew his fu*king brains out" committed the crimes at the DePalmas' home; (2) Jardin was trying to "minimize everything for [himself] as much as [he] can," and (3) he would be "lucky if they fu*king put a needle in [his] arm."  (Docs. 12-8 at 89 and 12-9 at 29, 52–53)

At trial, Jardin testified that two males named Rick and Bubb committed the crimes at the DePalmas' home.  (Doc. 12-18 at 44–46)  Because the suppressed statements contradicted Jardin's version of events on direct examination, undercut his credibility, and were not otherwise involuntary, the prosecutor fittingly used the suppressed statements to impeach Jardin.  *Harris v. New York*, 401 U.S. 222,

---

[6] These facts derive from the trial court's order granting Jardin's motion to suppress. (Doc. 12-10 at 57–63)

226 (1971) ("The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.  We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements."); *Oregon v. Hass*, 420 U.S. 714, 714–15 (1975) (applying *Harris* to "[w]hen a suspect, who is in the custody of a state police officer, has been given full *Miranda* warnings and accepts them, and then later states that he would like to telephone a lawyer but is told that this cannot be done until the officer and the suspect reach the station, and the suspect then provides inculpatory information").

An objection to the prosecutor's use of the suppressed statements would not have succeeded, and trial counsel was not ineffective.  *Meders v. Warden, Ga. Diag. Prison*, 911 F.3d 1335, 1354 (11th Cir. 2019) ("It is not ineffective assistance of counsel to fail to make an objection that is not due to be sustained.").

Jardin argues that, because his statements were involuntary, the prosecutor could not impeach him with the statements.  (Doc. 2 at 18–19)  The trial court did not find Jardin's statements involuntary (Doc. 12-10 at 57–63), and the statements were "the product of a rational intellect and a free will," despite the detective's violation of *Miranda*.  *Contrast with Mincey v. Arizona*, 437 U.S. 385, 401–02 (1978) ("It is apparent from the record in this case that Mincey's statements were not 'the product of his free and rational choice.'  To the contrary, the undisputed evidence makes clear that Mincey wanted *not* to answer Detective Hust.  But Mincey was weakened by pain and shock, isolated from family, friends, and

legal counsel, and barely conscious, and his will was simply overborne.") (citations

omitted and italics in original). *Accord Miller v. Dugger*, 838 F.2d 1530, 1537

(11th Cir. 1988) (citing *Frazier v. Cupp*, 394 U.S. 731, 738 (1969)) ("[The investigator

and sergeant] did, arguably, violate the rule of *Edwards v. Arizona*, 451 U.S. 477

(1981), requiring the cessation of police interrogation once a suspect has indicated

a wish to speak to an attorney. . . .   A violation of the *Edwards* rule . . . is not

necessarily coercive police conduct.").

Also, when impeached with the suppressed statements, Jardin admitted that

he lied to the detectives.  He lied when he told the detectives that a male named Tom

was at the DePalmas' home.  (Doc. 2 at 17)  He admitted that he was trying to

"minimize everything for [himself] as much as [he] can" and he would be "lucky if

they put a needle in [his] arm."  (Doc. 2 at 17)

On cross-examination Jardin admitted additional lies.  He admitted to lying

when he told the detectives (1) he did not know the DePalmas, (2) he did not know

anything about the homicides, (3) he had never visited the DePalmas' home, (4) he

did not know anyone who had visited the DePalmas' home, (5) he did not recognize

the DePalmas in a photograph on a flyer, (6) he was at the DePalmas' home with

a male named Chris and another male, and (7) he was at the DePalmas' home with

marijuana dealers.  (Doc. 12-18 at 57–59, 69–70)  Even without the prosecutor's

impeachment with the suppressed statements, Jardin admitted that he had repeatedly

lied and deceived the detectives.  Because the outcome at trial would not have

changed even if an objection to the suppressed statements had succeeded, the state

court did not unreasonably apply *Strickland*.  *Strickland*, 466 U.S. at 694.

### Sub-claim B

Jardin asserts that trial counsel was ineffective for not objecting to comments

by the prosecutor during closing argument about the suppressed statements.

(Doc. 2 at 17–18)  The post-conviction court denied the claim as follows (Doc. 12-23

at 137–38) (state court record citations omitted):

> [T]he Defendant states that counsel was ineffective for failing
> to object to the State's closing argument as improper when the
> State said that the Defendant's theory of defense "flies in the
> [f]ace of common sense," and when the State said "what he
> said was, then I will be lucky if they put a needle in my arm.
> Not my words, folks. The Defendant's words," and "[. . .] he
> was the one to say you can't kill and get away with it." The
> Defendant states that he was prejudiced by the failure to object
> because the issue was not preserved for appellate review,
> because it deprived him of a curative instruction that would
> have stopped the jury from considering the statements in their
> deliberation[,] and because "there is a high probability that
> minus these improper closing arguments, the jury would have
> returned a not guilty verdict."
>
> First, as the State notes in its response, while the Court's order
> granting the Defendant's motion to suppress, dated August 10,
> 2010, finds that there was a violation of the Defendant's
> *Miranda*[1] rights when officers from the Hernando County
> Sheriff's Office (HCSO) failed to re-advise the Defendant of his
> *Miranda* rights as his interview progressed, there was no finding
> that the Defendant's statements were involuntary. As a result,
> the Defendant's statements were admissible for the purpose
> of impeaching the Defendant at trial. *Harris v. New York*,
> 401 U.S. 222 (1971). The Defendant has not shown that
> counsel's failure to object to the State's closing argument
> denied him a curative instruction that would have stopped the
> jury from considering the statements in their deliberation and
> would have resulted in the jury returning a not guilty verdict.
> Counsel also addressed the Defendant's testimony in his closing
> argument to diffuse the impact of the Defendant's testimony,
> pointing out that the jury did not know the context of the

statements that the State was using to discredit the Defendant. The Defendant has not shown that there was act or omission on the part of counsel that was outside the broad range of reasonably competent performance under prevailing professional circumstances.

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Additionally, as the Defendant stated in his motion, his entire defense hinged on the jury believing that he had gone to the victims' house to buy cocaine[;] however, there was still testimony, by the Defendant, that he was present in the victims' house after the murders, did not call to report the murders and came into possession of objects that belonged to the victims. The Defendant also admitted to lying to officers regarding his original involvement with the murders. In light of the testimony and the presented evidence, the Defendant has not shown that the alleged omission so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

Jardin contends that trial counsel should have objected to the following comments.

### Comment One

[Prosecutor:]   What else did he say to law enforcement before he knew his DNA was found in the house? He didn't want to admit it in front of y'all. I had to ask him a couple of times what he said. What he said was, ["]Then I will be lucky if they put a needle in my arm.["] Not my words, folks. The defendant's words. You base your verdict in this case based upon the testimony and the evidence. That's what your duty is.

(Doc. 12-19 at 27)

On cross-examination Jardin admitted that he told the detective that he would be "lucky if they put a needle in [his] arm." (Doc. 12-18 at 84–85)  Even though the trial court suppressed the statement, the prosecutor fittingly impeached Jardin with the statement.  *Harris*, 401 U.S. at 226.  Also, the prosecutor fittingly commented on

the statement in closing argument to argue that Jardin was not credible as a witness. *Miller v. State*, 926 So. 2d 1243, 1254–55 (Fla. 2006) ("[A]n attorney is allowed to argue reasonable inferences from the evidence and to argue credibility of witnesses or any other relevant issue so long as the argument is based on the evidence.").  An objection to the comment would not have succeeded, and the state court did not unreasonably apply *Strickland*.  *Meders*, 911 F.3d at 1354.

### Comment Two

| [Prosecutor:] | And I submit to you that this whole story about Rick flies in the face of common sense. Doesn't know Rick's last name. Doesn't know Rick's cell phone number. Doesn't know anything else about Rick. Doesn't know anything, anything, anything about this guy Bubb that was picked up on the corner, okay? But he did tell you that he met Rick a few times to get drugs from him. And so Rick, the drug dealer, who hardly knows the defendant, he's going to take him along when he does a home invasion robbery, let alone a murder? Folks, that flies in the face of common sense. |

(Doc. 12-19 at 32–33)

Jardin testified that he went to the DePalmas' home with two males named Rick and Bubb to buy drugs, Rick and Bubb went inside the home, and he discovered the DePalmas dead when he went inside fifteen minutes later. (Doc. 12-18 at 41–45)  On cross-examination, Jardin admitted that he did not know Rick's last name, did not have Rick's mobile telephone number anymore, did not know Bubb's last name, and had met Bubb for the first time just before the murders. (Doc. 12-18 at 62–63)  The prosecutor fittingly relied on this testimony to argue

that Jardin's testimony "flie[d] in the face of common sense." *McGee v. State*,

83 So. 3d 837, 839 (Fla. 4th DCA 2011) ("The purpose of closing argument is to

present a review of the evidence and suggestions for drawing reasonable inferences

from the evidence.") (quotation marks and citation omitted).  Because an objection

would not have succeeded, the state court did not unreasonably apply *Strickland*.

*Meders*, 911 F.3d at 1354.

### Comment Three

> [Prosecutor:]      Remember, he's the one who told the detectives, again, in State's 59 that's in evidence, that he's got skeletons and demons in his closet. And he was the one to say you can't kill and get away with it. Not my words. The defendant's words.

(Doc. 12-19 at 35–36)

During the recorded interview played for the jury, Jardin told the detective:

"Everybody's [got] skeletons in their closet they don't want coming back biting them

in the a*s, somehow or another.  And I've got some demons that I just — I've done

stupid shit as a younger kid and kind of got away with it."  (Doc. 12-16 at 64–65)

Also the detective told Jardin, "Women: Can't live with them, can't live with them"

(Doc. 12-16 at 51), and Jardin responded, "Can't live with them, can't live without

them.  God knows you can't kill them and get away with it.  That's my philosophy

on how that [works]."  (Doc. 12-16 at 51)  The prosecutor fittingly commented on

this evidence.  *McGee*, 83 So. 3d at 839.  Because an objection would not have

succeeded, the state court did not unreasonably apply *Strickland*.  *Meders*, 911 F.3d

at 1354.

* * * *

The prosecutor made the disputed comments in his initial closing argument. (Doc. 12-19 at 27, 32–33, 35–36)  Trial counsel responded by arguing that the prosecutor took Jardin's statements out of context.  (Doc. 12-19 at 47–48, 54–55, 59–60)  Also, Jardin possessed items that belonged to the victims including a stereo, a vacuum, and a watch, admitted that he did not report the crimes to police, and admitted that he lied to police by denying any knowledge of the crimes.  (Doc. 12-18 at 43–45, 47–52)  Because Jardin's testimony undermined his own credibility and his defense depended on the jury believing his testimony, the outcome at trial would not have changed even if an objection to the comments had succeeded. Consequently, the state court did not unreasonably apply *Strickland*.  *Pope v. Sec'y, Fla. Dep't Corrs.*, 752 F.3d 1254, 1270–71 (11th Cir. 2014).  Ground Four is denied.

**Ground Five:**

Jardin asserts that the cumulative effect of trial counsel's deficient performance deprived him of a fair trial.  (Doc. 1 at 7)  Because no series of errors exists to accumulate, the cumulative-error claim is meritless.  *Morris v. Sec'y, Dep't Corrs.*, 677 F.3d 1117, 1132 (11th Cir. 2012).  Ground Five is denied.

## V.  CONCLUSION

Jardin's application for the writ of habeas corpus (Doc. 1) is **GRANTED** in part and **DENIED** in part.

A writ commanding Jardin's release will issue unless the State of Florida affords him a new trial within 180 days on all charges in *State v. Jardin*,

No. 08-CF-1683 (Fla. 5th Jud. Cir.).  (Doc. 12-23 at 1–23)  The issuance of the writ is stayed until the time to appeal expires (if no appeal occurs) or mandate by the court of appeals issues (if an appeal occurs).

The parties shall file a joint status report within sixty days. The clerk shall not enter a judgment pending further order, depending upon the State of Florida's compliance, but the clerk must **ADMINISTRATIVELY CLOSE** this action.

**CERTIFICATE OF APPEALABILITY**
**AND LEAVE TO APPEAL *IN FORMA PAUPERIS***

For the grounds denied with prejudice, because Jardin fails to demonstrate either a substantial showing of the denial of a constitutional right or that reasonable jurists would debate the merits of the grounds or the procedural issues, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  Jardin must obtain permission from the court of appeals to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on June 10, 2021.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE